FILED

2017 JUL 27  PM 2:53

DISTRICT COURT
LOS ANGELES

BY:_____

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

June 2017 Grand Jury 17 CR 00480 __

| UNITED STATES OF AMERICA, | CR No. 17- |
|---|---|
| Plaintiff, | I N D I C T M E N T |
| v. | [21 U.S.C. § 846: Conspiracy to (1) Distribute and Possess with Intent to Distribute Controlled Substances, and (2) Acquire a Controlled Substance by Misrepresentation, Fraud, Forgery, Deception, and Subterfuge; 21 U.S.C. § 841(a)(1): Distribution of and Possession with Intent to Distribute Controlled Substances; 18 U.S.C. § 371: Conspiracy to (1) Falsify, Conceal, and Cover Up a Material Fact Within Federal Jurisdiction, and (2) Engage in Witness Tampering; 18 U.S.C. § 1001(a)(3): Making and Using a False Writing Containing False Statements Within Federal Jurisdiction; 18 U.S.C. § 1001(a)(2): False Statement to a Law Enforcement Officer; 18 U.S.C. § 2(a): Aiding and Abetting; 21 U.S.C. § 853: Criminal Forfeiture] |
| MINAS MATOSYAN, aka "Mike," aka "Maserati Mike," ARMEN SIMONYAN, aka "Richard Simonson," aka "Nick," GRISHA SAYADYAN, aka "Grish," aka "George," SABRINA GUBERMAN, aka "Susie," FREDERICK MANNING, JR., aka "Freddie," FRED MINASSIAN, RALPH MANNING, HAYK MATOSYAN, aka "Hayko," GARY HENDERSON, FNU LNU, aka "Cindy," MARISA MONTENEGRO, ELIZABETH GURUMDZHYAN, and ANAIT GUYUMZHYAN, | |
| Defendants. | |

The Grand Jury charges:

1

COUNT ONE

2

[21 U.S.C. § 846]

3

A.   **OBJECTS OF THE CONSPIRACY**

4

Beginning on a date unknown, and continuing to a date not

5

earlier than July 27, 2017, in Los Angeles County, within the

6

Central District of California, and elsewhere, defendants MINAS

7

MATOSYAN, also known as ("aka") "Mike," aka "Maserati Mike"

8

("MATOSYAN"), ARMEN SIMONYAN, aka "Richard Simonson," aka "Nick"

9

("SIMONYAN"), GRISHA SAYADYAN, aka "Grish," aka "George"

10

("SAYADYAN"), SABRINA GUBERMAN, aka "Susie" ("GUBERMAN"),

11

FREDERICK MANNING JR., aka "Freddie" ("F. MANNING"), FRED

12

MINASSIAN ("MINASSIAN"), RALPH MANNING ("R. MANNING"), HAYK

13

MATOSYAN, aka "Hayko" ("H. MATOSYAN"), GARY HENDERSON

14

("HENDERSON"), FIRST NAME UNKNOWN ("FNU") LAST NAME UNKNOWN

15

("LNU"), aka "Cindy" ("CINDY"), MARISA MONTENEGRO

16

("MONTENEGRO"), ELIZABETH GURUMDZHYAN ("E. GURUMDZHYAN"), and

17

ANAIT GUYUMZHYAN ("A. GUYUMZHYAN"), and others known and unknown

18

to the Grand Jury, conspired and agreed with each other to

19

knowingly and intentionally commit one or more of the following

20

offenses:

21

1.   Distribution of oxycodone, a Schedule II narcotic drug

22

controlled substance, in violation of Title 21, United States

23

Code, Sections 841(a)(1), (b)(1)(C);

24

2.   Possession with intent to distribute oxycodone, a

25

Schedule II narcotic drug controlled substance, in violation of

26

Title 21, United States Code, Sections 841(a)(1), (b)(1)(C);

27

28

2

3.    Distribution of hydrocodone, a Schedule II narcotic drug controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1), (b)(1)(C);

4.    Possession with intent to distribute hydrocodone, a Schedule II narcotic drug controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1), (b)(1)(C);

5.    Distribution of amphetamine salts, a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1), (b)(1)(C);

6.    Possession with intent to distribute amphetamine salts, a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1), (b)(1)(C);

7.    Distribution of alprazolam, a Schedule IV controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1), (b)(2);

8.    Possession with intent to distribute alprazolam, a Schedule IV controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1), (b)(2); and

9.    Acquiring a controlled substance by misrepresentation, fraud, forgery, deception, and subterfuge, in violation of Title 21, United States Code, Section 843(a)(3).

B.    **MEANS BY WHICH THE OBJECTS OF THE CONSPIRACY WERE TO BE ACCOMPLISHED**

The objects of the conspiracy were to be accomplished, in substance, as follows:

1.    Defendant MATOSYAN would oversee sham medical clinics throughout the greater Los Angeles area, for the purpose of profiting from the sale of thousands of illegitimate

1  prescriptions (the "fraudulent prescriptions") for controlled

2  substances, including, but not limited to, oxycodone,

3  hydrocodone, amphetamine salts, and alprazolam.

4      2.   Defendants SIMONYAN, SAYADYAN, and GUBERMAN would

5  oversee the day-to-day management of the sham clinics.

6      3.   Defendant MATOSYAN would retain corrupt doctors who,

7  in turn, would allow the conspirators to issue fraudulent

8  prescriptions in the corrupt doctors' names in exchange for

9  kickbacks.

10     4.   Defendants MATOSYAN, SIMONYAN, GUBERMAN, and CINDY

11 would concoct lies to tell pharmacists in order to falsely

12 conceal that the conspirators had created and sold prescriptions

13 in the name of doctor E.S. ("E.S."), even though E.S. was

14 hospitalized or deceased at the time the fraudulent

15 prescriptions were issued.

16     5.   Defendants MATOSYAN, SIMOYAN, GUBERMAN, R. MANNING,

17 and H. MATOSYAN would steal the identity of doctor L.G.W.

18 ("L.G.W."), namely, by creating, selling, and filling fraudulent

19 prescriptions and related medical paperwork purportedly written

20 by L.G.W., without L.G.W.'s knowledge or authorization.

21     6.   Defendants MATOSYAN and R. MANNING would instruct

22 black market customers to provide them with the names and dates

23 of birth that the customers wanted to be included as "patient"

24 information on the fraudulent prescriptions.

25     7.   Defendants MATOSYAN, SIMONYAN, SAYADYAN, and GUBERMAN,

26 and others acting at their direction, would provide false

27 information to pharmacists, in response to inquiries from

28

4

pharmacists seeking to verify fraudulent prescriptions prior to filling them.

8.    Defendants MATOSYAN, R. MANNING, H. MATOSYAN, and HENDERSON would sell bulk quantities of oxycodone, hydrocodone, and alprazolam pills to black market customers, including to defendant F. MANNING.

9.    Defendants HENDERSON, MONTENEGRO, E. GURUMDZHYAN, and A. GUYUMZHYAN would fill fraudulent prescriptions for oxycodone and other narcotics that they had acquired from defendants MATOSYAN, SAYADYAN, and SIMONYAN for the purpose of acquiring bulk quantities of oxycodone to sell on the black market.

10.    Defendants MATOSYAN, F. MANNING, GUBERMAN, MINASSIAN, and CINDY would fraudulently cover up a law enforcement seizure of hydrocodone pills ("the seized hydrocodone") by arranging to falsely inform law enforcement that the seized hydrocodone had been legitimately prescribed either to defendant F. MANNING or to another person.

11.    Defendants MATOSYAN, F. MANNING, MINASSIAN, GUBERMAN, and CINDY would attempt to persuade doctor N.D. ("N.D.") to provide false information to law enforcement regarding the seized hydrocodone.

12.    Defendants MATOSYAN, F. MANNING, GUBERMAN, MINASSIAN, and CINDY would arrange for a fraudulent medical letter to be sent to law enforcement, which falsely represented that N.D. had legitimately prescribed the seized hydrocodone to defendant F. MANNING during a May 2016 medical visit.

C.   **OVERT ACTS**

In furtherance of the conspiracy and to accomplish the objects of the conspiracy, on or about the following dates, defendants MATOSYAN, SIMONYAN, SAYADYAN, GUBERMAN, F. MANNING, MINASSIAN, R. MANNING, H. MATOSYAN, HENDERSON, CINDY, MONTENEGRO, E. GURUMDZHYAN, and A. GUYUMZHYAN, and others known and unknown to the Grand Jury, committed various overt acts within the Central District of California, and elsewhere, including, but not limited to, the following:

**January-February 2016 Sales of Oxycodone Prescriptions to CS-1**

1.   On January 21, 2016, using coded language in a telephone conversation, defendant MATOSYAN spoke with a person believed to be a black market customer, but who was actually a confidential source working with law enforcement ("CS-1"), and agreed to speak with CS-1 on a later date to coordinate the sale of fraudulent oxycodone prescriptions to CS-1.

2.   On January 26, 2016, using coded language in a telephone conversation, defendant MATOSYAN agreed to sell CS-1 a fraudulent prescription for oxycodone at the price of $200, and instructed CS-1 to contact defendant R. MANNING to provide information necessary to complete the prescription, including the type of drug being prescribed and the name and date of birth of the "patient" to be named on the prescription.

3.   On January 27, 2016, using coded language in two telephone conversations and a text message, defendant MATOSYAN provided CS-1 with defendant R. MANNING's phone number and reiterated that CS-1 should provide defendant R. MANNING with the information necessary to complete the prescription.

4.   On January 27, 2016, using coded language in a telephone conversation, defendant R. MANNING confirmed to CS-1 that he (defendant R. MANNING) would complete the sale of the fraudulent prescription on defendant MATOSYAN's behalf, and instructed CS-1 to send him via text message the "patient" name, "patient" date of birth, and drug types that CS-1 wanted to be written on the fraudulent prescription.

5.   On January 27, 2016, defendant R. MANNING received a coded text message from CS-1 that included a "patient" name and date of birth belonging to a false alias, and that also included instructions for the fraudulent prescription to include 150 pills of 30-mg oxycodone.

6.   On January 27, 2016, at a parking lot in Los Angeles, California, defendant R. MANNING delivered to CS-1 a prescription for 150 pills of 30-mg oxycodone issued under the name of doctor R.G. ("R.G.") to a "patient" with the name and date of birth provided by CS-1, and accepted in return payment of $200 cash.

7.   On February 4, 2016, using coded language in a telephone conversation, defendant MATOSYAN agreed to sell three new fraudulent oxycodone prescriptions to CS-1, and defendant MATOSYAN instructed CS-1 to contact defendant R. MANNING to arrange the transaction, including for CS-1 to again provide defendant R. MANNING with the names, dates of birth, and drug types and quantities for the fraudulent prescriptions.

8.   On February 4, 2016, defendant R. MANNING received a coded text message from CS-1 that included three different "patient" names and dates of birth for the fraudulent

7

1  prescriptions to be sold to CS-1 during the upcoming
2  transaction.

3        9.    On February 5, 2016, defendant R. MANNING received a
4  coded text message from CS-1 requesting that a new "patient"
5  name be included on one of the fraudulent prescriptions.

6        10.   On February 5, 2016, using coded language in a text
7  message, defendant R. MANNING confirmed for CS-1 that he would
8  change the name of the "patient" on one of the prescriptions as
9  requested by CS-1.

10       11.   On February 5, 2016, in a parking lot in Los Angeles,
11 California, defendant R. MANNING delivered to CS-1 three
12 prescriptions, each for 150 pills of 30 mg oxycodone, issued
13 under the name of R.G. to "patients" with the names and dates of
14 birth provided by CS-1, and in return accepted payment of $600
15 cash.

16       12.   On February 24, 2016, using coded language in a
17 telephone conversation, defendant MATOSYAN agreed to sell CS-1
18 three new oxycodone prescriptions, and instructed CS-1 to
19 provide defendant R. MANNING with the information necessary to
20 complete the fraudulent prescriptions.

21       13.   On February 24, 2016, using coded language in a
22 telephone conversation, defendant MATOSYAN informed CS-1 that he
23 would be able to sell prescriptions to CS-1 under a new doctor's
24 name when his new clinic opened.

25       14.   On February 24, 2016, using coded language in a
26 telephone conversation, defendant R. MANNING instructed CS-1 to
27 send him the names and dates of birth to include on the
28 fraudulent prescriptions he was preparing for CS-1, after which

1 | CS-1 texted three different "patient" names and dates of birth
2 | to defendant R. MANNING.

3 |     15.  On February 24, 2016, at a convenience store parking
4 | lot in Los Angeles, California, defendant R. MANNING delivered
5 | to CS-1 three prescriptions, each for 150 pills of 30 mg
6 | oxycodone, issued under the name of R.G. to "patients" with the
7 | names and dates of birth provided by CS-1, and in return
8 | accepted payment of $600.

9 | **Prescriptions Issued in the Name of Deceased Doctor E.S.**
10 | April 27, 2016 Conversation between MATOSYAN and CINDY

11 |     16.  On April 27, 2016, using coded language in a telephone
12 | conversation, defendant CINDY informed defendant MATOSYAN that,
13 | according to an unidentified female conspirator ("UF-1"),
14 | pharmacists had called one of their medical clinics to verify
15 | prescriptions issued in the name of E.S., which posed a problem
16 | because E.S. was dead on the date when the fraudulent
17 | prescriptions had been issued under E.S.'s name.

18 |     17.  On April 27, 2016, using coded language in a telephone
19 | conversation, defendant MATOSYAN instructed defendant CINDY to
20 | warn UF-1 that if any pharmacists learned that prescriptions had
21 | been issued in the name of E.S. while he was hospitalized or
22 | after his death, "the first thing that they're going to do is
23 | call and tell the police that she billed under a doctor that was
24 | in the hospital and wrote prescriptions for a doctor in the
25 | hospital, so the first person who is going to be going to jail
26 | for life is her."

27 |     18.  On April 27, 2016, using coded language in a
28 | telephone conversation, defendant MATOSYAN informed defendant

CINDY that, when pharmacists call UF-1 to verify a prescription issued under E.S.'s name, UF-1 must falsely respond that E.S. is working at another location and therefore was unavailable to speak with the pharmacist.

19. On April 27, 2016, using coded language in a telephone conversation, defendant MATOSYAN informed defendant CINDY about a conversation that defendant MATOSYAN previously had with UF-1's husband, during which defendant MATOSYAN reminded UF-1's husband that he (defendant MATOSYAN) had provided to UF-1's husband a corrupt doctor, S.K., to use as part of a corrupt medical practice, that S.K. was "worth $120,000" in criminal proceeds to UF-1's husband, and that UF-1's husband needed to "pay me (defendant MATOSYAN) my fucking money right now" as compensation for defendant MATOSYAN providing S.K. to UF-1's husband.

20. On April 27, 2016, using coded language in a telephone conversation, defendant CINDY informed defendant MATOSYAN that she had also spoken to UF-1 and that UF-1 said that defendant MATOSYAN could take back S.K., to which defendant MATOSYAN responded, "I don't give a fuck. Doctors are like underwear to me: I don't take back used things. You understand? This isn't the way the world works."

21. On April 27, 2016, using coded language in a telephone conversation, at defendant MATOSYAN's request, defendant CINDY agreed to create fraudulent patient records under E.S.'s name.

///

///

///

1       May 12, 2016 Sale of Oxycodone Prescriptions to CS-1

2       22.   On May 12, 2016, using coded language in a telephone

3   conversation, defendant MATOSYAN agreed to sell additional

4   fraudulent prescriptions to CS-1.

5       23.   On May 12, 2016, in a grocery store parking lot in

6   Encino, California, defendant MATOSYAN delivered to CS-1 two

7   blank prescriptions under the name of E.S. and two blank

8   prescriptions under the name of R.G., in exchange for which

9   defendant MATOSYAN received $400 cash from CS-1.

10      24.   On May 12, 2016, in a grocery store parking lot in

11  Encino, California, defendant MATOSYAN instructed CS-1 to

12  contact defendant R. MANNING to purchase two additional

13  prescriptions.

14      25.   On May 12, 2016, in a grocery store parking lot in

15  Encino, California, defendant MATOSYAN invited CS-1 to bring

16  recruited patients to defendant MATOSYAN's new clinic and to

17  work at the clinic in exchange for payment in the form of both

18  money and fraudulent prescriptions.

19      26.   On May 12, 2016, using coded language in a telephone

20  conversation, defendant R. MANNING agreed to meet with CS-1

21  later that day and to deliver additional fraudulent

22  prescriptions to CS-1.

23      27.   On May 12, 2016, in a parking lot in Los Angeles,

24  California, defendant R. MANNING delivered to CS-1 two

25  prescriptions, each for 120 pills of 30 mg oxycodone, issued

26  under the name of E.S. to "patients" in names and dates of birth

27  previously provided to defendant R. MANNING by CS-1.

28

28. On May 12, 2016, in a parking lot in Los Angeles, California, defendant R. MANNING, after being informed by CS-1 that the prescriptions that defendant R. MANNING just delivered to CS-1 were unsigned, retrieved a pen and forged E.S.'s signature on both prescriptions.

Additional Intercepted Communications about E.S.

29. On April 28, 2016, using coded language in a telephone conversation, after being told by an unidentified customer that some pharmacies had refused to fill prescriptions because E.S. was deceased on the date the prescriptions purportedly were issued by him, defendant MATOSYAN agreed to deliver a new set of fraudulent prescriptions to the customer later that day.

30. On May 4, 2016, using coded language in a telephone conversation, defendant SIMONYAN informed defendant MATOSYAN that some of their employees became frightened on learning that prescriptions had been issued in the name of a deceased doctor.

31. On May 6, 2016, using coded language in a telephone conversation, defendant GUBERMAN warned defendant MATOSYAN that a Costco pharmacy repeatedly had called one of their medical clinics to inquire about E.S. prescriptions that a customer was attempting to fill, and defendant GUBERMAN warned defendant MATOSYAN to instruct the customer not to bring other E.S. prescriptions to the Costco pharmacy or the customer likely would be arrested.

32. On May 19, 2016, using coded language in a telephone conversation, defendant MATOSYAN told an unindicted co-conspirator that he (defendant MATOSYAN) planned on opening a new medical office, that the new office would issue

1    prescriptions in the name of E.S. even though E.S. was deceased,

2    and that defendant MATOSYAN had employees at the office who

3    would fraudulently verify the prescriptions in response to

4    inquiries by pharmacists.

### Identity Theft of L.G.W.

Defendant MATOSYAN Attempts to Recruit L.G.W and Arranges to

Produce Prescription Pads in L.G.W.'s Name

8    33.   On May 16, 2016, using coded language in two telephone

9    conversations, defendant MATOSYAN and an unidentified

10   conspirator discussed defendant MATOSYAN's plan to recruit

11   L.G.W. to work at one of defendant MATOSYAN's medical offices,

12   and defendant MATOSYAN asked the conspirator to provide him

13   (defendant MATOSYAN) with L.G.W.'s personal information

14   including his medical license number, telephone number, and

15   national provider identifier ("NPI") number.

16   34.   On May 19, 2016, using coded language in a telephone

17   conversation, defendant MATOSYAN offered L.G.W. a "very

18   lucrative" position working for defendant MATOSYAN in which

19   L.G.W. would "sit home making $20,000 a month doing nothing,"

20   which L.G.W. declined to accept.

21   35.   On May 24, 2016, using coded language in a telephone

22   conversation and text message, defendant MATOSYAN sent L.G.W.'s

23   personal information, including his full name, medical license

24   number, and NPI number, to an unidentified conspirator, and

25   defendant MATOSYAN confirmed that the conspirator would obtain a

26   prescription pad in L.G.W.'s name at a printing shop in

27   Hollywood, California.

28

<u>Defendant MATOSYAN Sells an L.G.W. Oxycodone Prescription</u>

<u>to UM-1 and Arranges to Deceive a Pharmacist</u>

36. On June 8, 2016, using coded language in a series of telephone conversations and text message, defendant MATOSYAN arranged to deliver to an unidentified male customer ("UM-1") an L.G.W. prescription for 150 pills of oxycodone and 90 pills of alprazolam, and UM-1 provided defendant MATOSYAN with the "patient" name and date of birth to include on the prescription.

37. On June 8, 2016, in Encino, California, defendant MATOSYAN delivered to UM-1 an L.G.W. prescription for oxycodone and hydrocodone.

38. On June 8, 2016, using coded language in two telephone conversations, defendant MATOSYAN, after being advised by UM-1 that the L.G.W. prescription that defendant MATOSYAN just delivered included hydrocodone rather than alprazolam, agreed to meet with UM-1 to deliver a corrected prescription.

39. On June 9, 2016, using coded language in a telephone conversation, defendant MATOSYAN spoke with UM-1 about how a pharmacist was going to contact defendant MATOSYAN's office to verify the L.G.W. prescription, and that the pharmacist did not need to speak with L.G.W. but would need to obtain medical paperwork in support of the prescription.

40. On June 10, 2016, using coded language in a telephone conversation, defendant GUBERMAN informed defendant MATOSYAN that defendant MATOSYAN needed to sign fraudulent medical paperwork in the name of patient T.B. (the "patient" name on the fraudulent prescription that defendant MATOSYAN delivered to UM-

1  two days earlier), and defendant MATOSYAN agreed to meet

2  defendant GUBERMAN at a medical office to do so.

3  Defendant MATOSYAN Sells L.G.W. Oxycodone Prescriptions to UF-2

4      41.  On June 8, 2016, using coded language in a telephone

5  conversation, defendant MATOSYAN agreed to sell prescriptions at

6  a cost of $200 each to an unidentified female customer ("UF-2")

7  who called on behalf of defendant F. MANNING seeking to purchase

8  four to five fraudulent prescriptions.

9      42.  On June 8, 2016, using coded language in a telephone

10 conversation, defendant MATOSYAN agreed to send UF-2 the name

11 and federal controlled drug registration number of the doctor

12 who would be named on the fraudulent prescriptions, so that UF-2

13 could attempt to verify whether the doctor was the subject of

14 any investigation by law enforcement.

15     43.  On June 8, 2016, defendant MATOSYAN sent to UF-2 a

16 text message that included L.G.W.'s name, NPI number, medical

17 license number, and federal controlled drug registration number.

18     44.  On June 17, 2016, using coded language in a telephone

19 conversation, defendant MATOSYAN agreed to meet UF-2 later that

20 day to complete the oxycodone transaction and further advised

21 UF-2 to avoid filling the fraudulent prescriptions at a major

22 chain pharmacy such as a Walgreens pharmacy, which defendant

23 MATOSYAN said were more likely to want to contact the

24 prescribing physician to verify the fraudulent prescriptions.

25     45.  On June 17, 2016, using coded language in a series of

26 text messages, UF-2, acting at defendant MATOSYAN's direction,

27 provided defendant MATOSYAN with three different "patient" names

28

and dates of birth to use in writing the fraudulent prescriptions to be sold to UF-2 later that day.

46. On June 17, 2016, defendant MATOSYAN delivered three prescriptions, each for 150 pills of 30-mg oxycodone, issued under L.G.W.'s name to the "patient" names and dates of birth previously provided by UF-2.

Defendant MATOSYAN Delivers L.G.W. Oxycodone Prescriptions to
Defendant HENDERSON

47. On June 23, 2016, using coded language in a telephone conversation, defendant MATOSYAN agreed to deliver fraudulent oxycodone prescriptions to defendant HENDERSON later that day.

48. On June 23, 2016, using coded language in a series of text messages, defendant HENDERSON sent four different "patient" names and dates of birth to use in writing the fraudulent oxycodone prescriptions, and defendant MATOSYAN confirmed that he (defendant MATOSYAN) would deliver the fraudulent prescriptions to defendant HENDERSON within the next hour.

49. On June 23, 2016, using coded language in two telephone conversations, defendants MATOSYAN and HENDERSON discussed how fraudulent prescriptions should be written for oxycodone at 30-mg strength and the phone number that should be provided to pharmacists who wanted to verify a fraudulent prescription.

50. On June 23, 2016, at a parking lot in Encino, California, defendant MATOSYAN delivered four fraudulent prescriptions, each for 150 pills of 30-mg oxycodone, to defendant HENDERSON, with each issued under L.G.W.'s name and

1  for "patients" with the names and dates of birth previously
2  provided by defendant HENDERSON

3      51. On June 23, 2016, using coded language in two
4  telephone conversations, defendant HENDERSON informed defendant
5  MATOSYAN that law enforcement conducted a traffic stop of
6  defendant HENDERSON's car and seized the four oxycodone
7  prescriptions that defendant MATOSYAN had just delivered to
8  defendant HENDERSON.

9      Defendants MATOSYAN, R. MANNING, and H. MATOSYAN Fill a
10     Fraudulent L.G.W. Prescription and Deliver Oxycodone Pills

11     52. On June 17, 2016, using coded language in a series of
12 telephone conversations, defendant H. MATOSYAN agreed to assist
13 defendant R. MANNING in filling a prescription issued under
14 L.G.W.'s name at a pharmacy in Encino, California, and defendant
15 MATOSYAN agreed to give defendant H. MATOSYAN the fraudulent
16 prescription to be filled at the pharmacy and cash to pay for
17 the cost of filling the prescription.

18     53. On June 17, 2016, at a pharmacy in Encino, California,
19 defendants R. MANNING and H. MATOSYAN attempted to fill a
20 fraudulent prescription issued under L.G.W.'s name for
21 oxycodone, hydrocodone, and alprazolam.

22     54. On June 17, 2016, using coded language in a telephone
23 conversation, defendant H. MATOSYAN told defendant MATOSYAN that
24 the pharmacy had only 20 pills of oxycodone available, and thus
25 could only partially fill the fraudulent prescription that
26 defendants R. MANNING and H. MATOSYAN had presented.

27     55. On June 17, 2016, using coded language in a telephone
28 conversation, defendant MATOSYAN arranged for an unidentified

male drug customer ("UM-2") to meet defendant H. MATOSYAN later that day, so that defendant H. MATOSYAN would deliver 20 pills of oxycodone to UM-2.

56. On June 17, 2016, using coded language in a series of telephone conversations, defendant H. MATOSYAN agreed to deliver 20 pills of oxycodone to UM-2 later that day at a restaurant in Sherman Oaks, California.

57. On June 17, 2016, using coded language in a telephone conversation, defendant H. MATOSYAN confirmed to defendant MATOSYAN that he delivered 20 pills of oxycodone to UM-2.

58. On June 20, 2016, using coded language in a series of telephone conversations, defendant H. MATOSYAN confirmed that he and defendant R. MANNING would pick up 130 pills of oxycodone from the pharmacy in Encino, California, which represented the unfilled portion of the L.G.W. prescription that defendants H. MATOSYAN and R. MANNING had attempted to fill at the pharmacy three days earlier.

59. On June 20, 2016, using coded language in a telephone conversation, defendant R. MANNING agreed that he, defendant H. MATOSYAN, and an unidentified co-conspirator would pick up the remaining 130 pills of oxycodone and deliver them to UM-2, and defendant MATOSYAN confirmed that UM-2 would have money on hand to complete the transaction.

60. On June 20, 2016, using coded language in two telephone conversations, defendant MATOYSAN confirmed that UM-2 would meet with defendant H. MATOSYAN later that day to purchase 130 pills of oxycodone, and defendant MATOSYAN told UM-2 to

provide defendant H. MATOSYAN with names to include as "patients" for future fraudulent prescriptions.

61.   On June 20, 2016, using coded language in a telephone conversation, defendant H. MATOSYAN informed defendant MATOSYAN that the pharmacy had not yet received an expected wholesale shipment of oxycodone pills and that a pharmacy employee would notify defendant H. MATOSYAN when the pharmacy had the remaining 130 pills of oxycodone in stock.

62.   On June 27, 2016, using coded language in a telephone conversation, defendant R. MANNING told defendant MATOSYAN that he (defendant R. MANNING) was aware of people who could purchase L.G.W. controlled drug prescriptions, and defendant MATOSYAN agreed to sell the prescriptions but stressed the need for defendant R. MANNING to instruct the potential customers to take the prescriptions to pharmacies that would fill the L.G.W. prescriptions without verifying them.

Defendants R. MANNING and SIMONYAN fill L.G.W. Prescriptions

63.   On June 27, 2016, defendant SIMONYAN, using the alias "Richard Simonson," filled a prescription issued under L.G.W.'s name for oxycodone.

64.   On July 20, 2016, defendant R. MANNING filled prescriptions issued under L.G.W.'s name for oxycodone, hydrocodone, and alprazolam.

65.   On July 27, 2016, defendant SIMONYAN, using the alias "Richard Simonson," filled a prescription issued under L.G.W.'s name for oxycodone.

66.   On August 25, 2016, defendant R. MANNING filled prescriptions issued under L.G.W.'s name for oxycodone, hydrocodone, and alprazolam.

67.   On September 20, 2016, defendant R. MANNING filled prescriptions issued under L.G.W.'s name for oxycodone, hydrocodone, and alprazolam.

68.   On October 19, 2016, defendant R. MANNING filled prescriptions issued under L.G.W.'s name for oxycodone, hydrocodone, and alprazolam.

### Seizure of Hydrocodone from Defendant F. MANNING and Conspiracy to Provide Fraudulent Records to Law Enforcement

69.   On May 18, 2016, using coded language in a series of telephone conversations, defendants MATOSYAN and HENDERSON arranged to meet in Encino, California to deliver 500 pills of oxycodone and hydrocodone to defendant F. MANNING.

70.   On May 18, 2016, using coded language in two telephone conversations, defendant MATOSYAN arranged to deliver 500 pills of oxycodone and hydrocodone to defendant F. MANNING in exchange for $1,600, and defendant MATOSYAN confirmed that defendant HENDERSON could sell 1,000 pills per week of narcotics to defendant F. MANNING in future transactions.

71.   On May 18, 2016, in Encino, California, defendants MATOSYAN and HENDERSON delivered 500 pills of oxycodone and hydrocodone to defendant F. MANNING.

72.   On May 18, 2016, using coded language in a telephone conversation, defendant F. MANNING reported to defendant MATOSYAN that a law enforcement officer had pulled over defendant F. MANNING's car for a traffic violation, and had

seized 140 pills of hydrocodone ("the seized hydrocodone"), but that the officer did not find the additional oxycodone pills that defendants MATOSYAN and HENDERSON had also just delivered to defendant F. MANNING.

73. On May 18, 2016, using coded language in a telephone conversation, defendant F. MANNING told defendant MATOSYAN that defendant F. MANNING had falsely told the officer conducting the traffic stop that the seized hydrocodone had been legitimately prescribed to defendant F. MANNING by R.G.

74. On May 18, 2016, using coded language in a telephone conversation, defendant MATOSYAN assured defendant F. MANNING that defendant MATOSYAN would be able to fraudulently cover up the drug seizure by obtaining a letter from a doctor purporting that the doctor had legitimately prescribed the seized hydrocodone to defendant F. MANNING because, for $200, the doctor would "do whatever the hell we want him to."

75. On June 10, 2016, using coded language in a telephone conversation, defendant MATOSYAN told defendant CINDY that defendants MATOSYAN, F. MANNING, and MINASSIAN had met and created a plan to fraudulently cover up the seizure of the hydrocodone pills.

76. On June 10, 2016, using coded language in a telephone conversation, defendant MATOSYAN informed defendant CINDY that defendants MATOSYAN, F. MANNING, and MINASSIAN agreed that an unidentified female "patient" ("UF-3") would falsely claim to law enforcement that the seized hydrocodone had been legitimately prescribed to her, and that UF-3 would falsely

1   claim that she had accidentally left the seized hydrocodone in

2   defendant F. MANNING's car.

3      77. On June 10, 2016, using coded language in a telephone

4   conversation, defendant CINDY asked whether all the conspirators

5   involved in the cover-up would stand by the false story during

6   an interview with law enforcement or during court testimony, and

7   defendant MATOSYAN responded that he (defendant MATOSYAN)

8   planned to pay $700 to UF-3, $500 to the doctor, and $200 to the

9   doctor's receptionist to compensate them for falsely "verifying"

10   the story, for generating fraudulent supporting medical

11   documentation, and for placing an entry in the medical office's

12   patient logs falsely reflecting that UF-3 had previously visited

13   the office.

14      78. On June 10, 2016, using coded language in a telephone

15   conversation, defendant MATOSYAN informed defendant CINDY that,

16   according to defendant MINASSIAN, law enforcement would not

17   attempt to conduct follow-up investigation upon receiving a

18   doctor's letter fraudulently claiming to have legitimately

19   prescribed the seized hydrocodone to UF-3.

20      79. On June 21, 2016, defendant F. MANNING spoke with a

21   law enforcement officer, during which defendant F. MANNING

22   stated that defendant F. MANNING's attorney (defendant

23   MINASSIAN) would be providing the law enforcement officer with a

24   doctor's letter regarding the seized hydrocodone.

25      80. On June 21, 2016, using coded language in a telephone

26   conversation, defendant F. MANNING informed defendant MATOSYAN

27   that a law enforcement officer had just contacted him to obtain

28   a copy of medical paperwork regarding the seized hydrocodone,

1  and defendant MATOSYAN agreed to have the fraudulent medical
2  records ready by the end of the week.

3      81.  On June 21, 2016, using coded language in a telephone
4  conversation, defendant MATOSYAN agreed to meet with defendants
5  F. MANNING and MINASSIAN to discuss how to respond to law
6  enforcement regarding the seized hydrocodone, and defendant F.
7  MANNING stated that defendant MINASSIAN no longer believed that
8  defendant MATOSYAN's plan (claiming that the seized hydrocodone
9  had been prescribed to UF-3) would persuade law enforcement.

10      82.  On June 22, 2016, using coded language in a telephone
11  conversation, defendant MATOSYAN instructed defendant F. MANNING
12  to have defendant CINDY bring a magnetic resonance imaging
13  ("MRI") report to defendant MATOSYAN, and that defendant
14  MATOSYAN would use the MRI report to generate a fraudulent
15  medical record to send to law enforcement regarding the seized
16  hydrocodone.

17      83.  On June 29, 2016, using coded language in a telephone
18  conversation, defendant MINASSIAN instructed defendant MATOSYAN
19  to falsely state, in a fraudulent medical letter that defendant
20  MATOSYAN would create, that the seized hydrocodone had been
21  prescribed to defendant F. MANNING by a doctor to treat back
22  pain during a medical examination on May 10, 2016.

23      84.  On July 1, 2016, defendant MINASSIAN sent a fax to law
24  enforcement that included a fraudulent medical letter under
25  N.D.'s name, which falsely claimed that N.D. prescribed 150
26  pills of hydrocodone to defendant F. MANNING during a medical
27  examination on May 10, 2016.

28  ///

85.   On July 6, 2016, using coded language in a telephone conversation, defendant GUBERMAN informed defendant MATOSYAN that a law enforcement officer had contacted N.D. directly, during which N.D. told the law enforcement officer that N.D. had never seen defendant F. MANNING as a patient and did not prescribe hydrocodone to defendant F. MANNING, and that defendant SIMONYAN was angry as a result of the law enforcement officer's unexpected call to N.D.

86.   On July 6, 2016, using coded language in a telephone conversation, defendant GUBERMAN informed defendant MATOSYAN that it was too late to attempt to persuade N.D. to contact the law enforcement officer to falsely "verify" that N.D. had prescribed the seized hydrocodone to defendant F. MANNING, and suggested that she (defendant GUBERMAN) would find a different doctor who would falsely verify prescribing hydrocodone to defendant F. MANNING and would provide fraudulent supporting medical paperwork.

87.   On July 6, 2016, using coded language in a telephone conversation, defendants MATOSYAN and GUBERMAN discussed whether N.D. would accept a bribe of $2,000 to retract his statement to law enforcement and to falsely confirm that N.D. had prescribed the seized hydrocodone to defendant F. MANNING.

88.   On July 6, 2016, using coded language in a telephone conversation, defendant MATOSYAN informed defendant CINDY that "the problem is fixable" and that defendant MATOSYAN would visit N.D. the following morning to persuade N.D. to falsely retract his prior statement to law enforcement.

89.  On July 6, 2016, using coded language in a series of telephone conversations, defendant GUBERMAN informed defendant MATOSYAN that an unidentified female ("UF-4") worked at a doctor's office, and that UF-4 could help defendant MATOSYAN in creating fraudulent paperwork regarding the seized hydrocodone in exchange for $3,000.

90.  On July 6, 2016, using coded language in a telephone conversation, defendant MATOSYAN informed defendant SIMONYAN that upcoming sales of fraudulent prescriptions needed to be postponed because of the law enforcement investigation into the seized hydrocodone, and that it would cost $3,500 to complete the fraudulent cover-up of the hydrocodone seizure, including $500 that would be paid to defendant GUBERMAN; defendant SIMONYAN responded that defendant F. MANNING was wealthy and should be required to reimburse the $3,500.

91.  On July 6, 2016, using coded language in a telephone conversation, defendant MATOSYAN informed defendant MINASSIAN that a law enforcement officer called N.D. and that N.D. denied prescribing the seized hydrocodone to defendant F. MANNING, at which time defendant MATOSYAN chastised defendant MINASSIAN for rejecting his original plan of claiming that the seized hydrocodone had been prescribed to UF-3.

92.  On July 6, 2016, using coded language in a telephone conversation, defendant MINASSIAN stated that he (defendant MINASSIAN) assumed that N.D. was "on board" when defendant MINASSIAN agreed to send the fraudulent letter under N.D.'s name to law enforcement, to which defendant MATOSYAN responded that N.D. was "not on board;" defendant MINASSIAN stated that he

(defendant MINASSIAN) would attempt to come up with an
alternative plan and would contact defendant MATOSYAN later.

93.  On July 6, 2016, using coded language in a telephone
conversation, defendants MATOSYAN and F. MANNING discussed how
defendants F. MANNING and MINASSIAN had rejected defendant
MATOSYAN's original plan to use UF-3 to cover up the seized
hydrocodone, how defendant MINASSIAN had devised the alternative
plan of falsely claiming that the seized hydrocodone had been
prescribed to defendant F. MANNING rather than to UF-3, and how
defendant F. MANNING had miscalculated when he promised that law
enforcement would not attempt to verify the fraudulent medical
documentation, and defendant F. MANNING stated that he
(defendant F. MANNING) would be "locked up" as a result of
defendant MATOSYAN's failure to stop the law enforcement
investigation.

94.  On July 6, 2016, using coded language in a telephone
conversation, defendants MATOSYAN and CINDY discussed whether
they could attempt to bribe the law enforcement officers
investigating the hydrocodone seizure to stop the investigation
from continuing.

95.  On July 6, 2016, using coded language in a telephone
conversation, defendant MINASSIAN told defendant MATOSYAN that
he (defendant MINASSIAN) had asked defendant F. MANNING to
provide "a letter from a doctor, any doctor" falsely purporting
to verify the prescription, and the two then agreed that
defendant MATOSYAN would attempt to bribe N.D. to fraudulently
claim that N.D. had prescribed the seized hydrocodone to
defendant F. MANNING.

96.   On July 6, 2016, defendant MINASSIAN spoke with a law enforcement officer, during which defendant MINASSIAN falsely claimed that he was not aware that N.D. had denied writing the letter that defendant MINASSIAN had sent to law enforcement on July 1, 2016, that defendant MINASSIAN had been told by defendant F. MANNING that the seized hydrocodone was legitimately prescribed to defendant F. MANNING by N.D., and that defendant MINASSIAN believed that the letter was genuine when defendant MINASSIAN sent it to law enforcement.

97.   On July 6, 2016, using coded language in a telephone conversation, defendant MATOSYAN informed defendant F. MANNING that he (defendant MATOSYAN) and defendant CINDY would try to convince N.D. to falsely tell law enforcement that N.D. prescribed the seized hydrocodone to defendant F. MANNING.

98.   On July 6, 2016, using coded language in two telephone conversations and a text message, defendant MATOSYAN arranged for UF-4 to generate fraudulent medical records reflecting that an unidentified doctor prescribed the seized hydrocodone to defendant F. MANNING.

99.   On July 6, 2016, using coded language in a telephone conversation, defendant GUBERMAN confirmed for defendant MATOSYAN that UF-4 would be able to generate fraudulent medical paperwork regarding the seized hydrocodone.

100.   On July 6, 2016, using coded language in a telephone conversation, defendant MATOSYAN told defendant CINDY that he planned to continue trying to convince N.D. to inform law enforcement that N.D. had prescribed the seized hydrocodone to defendant F. MANNING, and that he had developed a back-up plan

in the event that N.D. did not agree to do so, at which time defendant CINDY offered to join defendant MATOSYAN in persuading N.D. to lie to law enforcement about the seized hydrocodone.

101. On July 7, 2016, using coded language in a telephone conversation, defendant MATOSYAN assured defendant F. MANNING that he (defendant MATOSYAN) had spoken to N.D. three times earlier that day and that defendant MATOSYAN was intent on convincing N.D. to lie to law enforcement about the seized hydrocodone.

102. On August 26, 2016, defendant MINASSIAN falsely assured a law enforcement officer that defendant F. MANNING was being honest in claiming that the seized hydrocodone had been legitimately prescribed to defendant F. MANNING by a doctor, and further falsely claimed that N.D. was confused in previously denying that he (N.D.) prescribed the seized hydrocodone to defendant F. MANNING.

### Additional Overt Acts

#### Defendant MATOSYAN

103. On May 3, 2016, using coded language in a telephone conversation, defendant MATOSYAN confirmed that an unidentified female conspirator ("UF-5") would provide him with an unspecified number of 30-mg oxycodone pills at a price of $15 per pill.

104. On June 22, 2016, using coded language in a telephone conversation, defendant MATOSYAN confirmed that an unindicted co-conspirator was at a print shop purchasing 100 prescription pads under R.G.'s name, and defendant MATOSYAN provided the serial numbers to be printed on the prescriptions.

105. On June 22, 2016, using coded language in a telephone conversation, defendant MATOSYAN agreed to supply a fraudulent prescription for 120 pills of amphetamine salts for an unidentified male customer ("UM-3"), and further instructed UM-3 to make sure that the "patient" named on the prescription was young to help ensure that a pharmacy would fill the prescription.

106. On June 29, 2016, using coded language in a telephone conversation, defendant MATOSYAN contacted defendant F. MANNING to broker a drug transaction, in which defendant F. MANNING would purchase 1,000 pills of 30-mg oxycodone and 1,000 pills of 10-mg hydrocodone from an unidentified co-conspirator, and which defendant F. MANNING agreed to carry out.

### Defendant SIMONYAN

107. On June 13, 2016, using coded language in a telephone conversation, defendants MATOSYAN and SIMONYAN discussed how defendant MATOSYAN was arranging to hire a new doctor, who would issue fraudulent prescriptions to 20 patients per day, two to three times per week, at a price of $300 per prescription, and defendants MATOSYAN and SIMONYAN agreed that they could place the doctor's actual information on the header of prescriptions because the doctor was aware that the prescriptions were fraudulent and would "verify" these prescriptions to any pharmacist who inquired about their authenticity.

108. On June 29, 2016, using coded language in a telephone conversation, defendant SIMONYAN, after being told by defendant MATOSYAN that the female receptionists working under defendant SIMONYAN's authority needed to do a better job in fraudulently

1   verifying prescriptions in response to inquiries from
2   pharmacists, responded that defendant MATOSYAN should provide
3   him with more capable employees.

4       109. On June 29, 2016, using coded language in a telephone
5   conversation, defendants MATOSYAN and SIMONYAN discussed how
6   several of defendant SIMONYAN's customers were under
7   investigation by law enforcement, with defendant MATOSYAN
8   agreeing to obtain for defendant SIMONYAN a list of the names of
9   the customers who were being investigated.

10      110. On July 1, 2016, using coded language in a telephone
11  conversation, defendant SIMONYAN informed defendant MATOSYAN
12  that he (defendant SIMONYAN) was going to a printing shop to
13  obtain new prescription pads, and defendant MATOSYAN agreed that
14  defendant SIMONYAN should do so because defendant MATOSYAN was
15  about to sell his remaining prescriptions.

16                          Defendant SAYADYAN

17      111. On October 14, 2016, using coded language in a series
18  of text messages, defendant SAYADYAN agreed to sell 100 pills of
19  oxycodone to an unidentified female customer ("UF-6") in
20  exchange for $15 per pill.

21      112. On October 14, 2016, using coded language in a text
22  message, defendant SAYADYAN agreed to deliver 100 pills of
23  oxycodone to UF-6 later that day in Van Nuys, California.

24      113. On October 25, 2016, using coded language in a series
25  of text messages, defendants SAYADYAN and UF-6 discussed a
26  future transaction involving 100 pills of 30-mg oxycodone.

27      114. On November 11, 2016, using coded language in a series
28  of text messages, defendant SAYADYAN arranged to meet with UF-6,

1  so that UF-6 could deliver the $600 owed to defendant SAYADYAN

2  from a prior drug transaction.

3      115. On December 15, 2016, using coded language in a series

4  of text messages, defendant SAYADYAN arranged to sell 400 pills

5  of 30-mg oxycodone to UF-6 at the price of $15 per pill.

6      116. On January 2, 2017, using coded language in a text

7  message, defendant SAYADYAN agreed to sell 90 pills of 30-mg

8  oxycodone to UF-6 later that day in Burbank, California.

9      117. On January 10, 2017, using coded language in a series

10  of text messages, defendant SAYADYAN arranged to sell 120 pills

11  of 30-mg oxycodone to UF-6.

12      118. On March 8, 2017, using coded language in a series of

13  text messages, defendant SAYADYAN arranged to sell 80 pills of

14  30-mg oxycodone to UF-6.

15                    Defendant GUBERMAN

16      119. On June 17, 2016, using coded language in a telephone

17  conversation, defendant GUBERMAN told defendant MATOSYAN that

18  new "patients" needed to be instructed to notify defendant

19  GUBERMAN before bringing fraudulent prescriptions to pharmacies,

20  so that defendant GUBERMAN could prepare to falsely "verify" the

21  fraudulent prescriptions should there be a pharmacist inquiry.

22      120. On June 20, 2016, using coded language in a telephone

23  conversation, defendant GUBERMAN asked defendant MATOSYAN

24  whether defendant H. MATOSYAN could forge a doctor's signature

25  on medical paperwork regarding fraudulent prescriptions for

26  oxycodone and alprazolam to an unidentified customer, and

27  defendants GUBERMAN and MATOSYAN agreed that defendant SIMOYNAN

28  would forge the signature on the paperwork instead.

1   121. On July 6, 2016, using coded language in a telephone

2   conversation, defendant GUBERMAN told defendant MATOSYAN that

3   she would call a pharmacy to falsely verify a fraudulent

4   prescription for oxycodone and alprazolam sold to a customer.

5   122. On July 6, 2016, using coded language in a telephone

6   conversation, defendant GUBERMAN reported to defendant MATOSYAN

7   that a pharmacy refused to fill a customer's fraudulent

8   prescription, and defendant MATOSYAN responded that defendant

9   GUBERMAN should advise the customer to take the fraudulent

10   prescription to a different pharmacy.

11   123. On July 6, 2016, using coded language in a telephone

12   conversation, defendant GUBERMAN asked defendant MATOSYAN to

13   give her a fraudulent prescription for unspecified drugs for

14   which she could provide a false "patient" name and date of birth

15   to use in completing the prescription, which defendant MATOSYAN

16   agreed to do at his residence.

17                       Defendant MONTENEGRO

18   124. On October 6, 2015, defendant MONTENEGRO attempted to

19   fill a fraudulent prescription for oxycodone at a pharmacy in

20   Thousand Oaks, California.

21   125. On October 21, 2015, defendant MONTENEGRO arranged for

22   a third party "patient" to fill a fraudulent prescription for

23   oxycodone at a pharmacy in Thousand Oaks, California.

24   126. On October 23, 2015, defendant MONTENEGRO arranged for

25   a third party "patient" to fill a fraudulent prescription for

26   oxycodone at a pharmacy in Moorpark, California.

27   127. On November 13, 2015, at locations including her

28   residence in West Hills, California, and her vehicle, defendant

MONTENEGRO possessed, among other things, approximately $70,000 in cash proceeds, multiple oxycodone prescriptions to various third party "patients," and patient "profiles" in the names of third parties, namely, copies of driver's licenses and Medicare and/or Medi-Cal cards in third party names.

### Defendants E. GURUMDZHYAN and A. GUYUMZHYAN

128. On December 15, 2015, defendant E. GURUMDZHYAN attempted to fill a fraudulent prescription for oxycodone at a pharmacy in Simi Valley, California.

129. On December 18, 2015, defendants E. GURUMDZHYAN and A. GUYUMZHYAN traveled to the pharmacy in Simi Valley, California, in a further attempt to obtain oxycodone pills based on the fraudulent oxycodone prescription that defendant E. GURUMDZHYAN had attempted to fill three days earlier.

130. On December 21, 2015, defendant E. GURUMDZHYAN filled a fraudulent oxycodone prescription in a third party name at a pharmacy in Thousand Oaks, California.

131. On December 23, 2015, at locations including their residence in Los Angeles, California, defendants E. GURUMDZHYAN and A. GUYUMZHYAN possessed, among other things, multiple oxycodone prescriptions in the names of various third party "patients;" multiple signed oxycodone prescriptions for which the patient name, date of birth, and issuing date was left blank; patient "profiles" in third party names; 39 pills of alprazolam bearing a label reflecting that the prescription had been issued to a third party "patient;" and approximately $6,122 in cash proceeds.

COUNT TWO

[21 U.S.C. §§ 841(a)(1), (b)(1)(C); 18 U.S.C. § 2(a)]

On or about January 27, 2016, in Los Angeles County, within the Central District of California, defendants MINAS MATOSYAN, also known as ("aka") "Mike," aka "Maserati Mike," and RALPH MANNING, each aiding and abetting the other, knowingly and intentionally distributed oxycodone, a Schedule II narcotic drug controlled substance.

COUNT THREE

[21 U.S.C. §§ 841(a)(1), (b)(1)(C); 18 U.S.C. § 2(a)]

On or about February 5, 2016, in Los Angeles County, within the Central District of California, defendants MINAS MATOSYAN, also known as ("aka") "Mike," aka "Maserati Mike," and RALPH MANNING, each aiding and abetting the other, knowingly and intentionally distributed oxycodone, a Schedule II narcotic drug controlled substance.

COUNT FOUR

[21 U.S.C. §§ 841(a)(1), (b)(1)(C); 18 U.S.C. § 2(a)]

On or about February 24, 2016, in Los Angeles County, within the Central District of California, defendants MINAS MATOSYAN, also known as ("aka") "Mike," aka "Maserati Mike," and RALPH MANNING, each aiding and abetting the other, knowingly and intentionally distributed oxycodone, a Schedule II narcotic drug controlled substance.

COUNT FIVE

[21 U.S.C. §§ 841(a)(1), (b)(1)(C); 18 U.S.C. § 2(a)]

On or about May 12, 2016, in Los Angeles County, within the Central District of California, defendants MINAS MATOSYAN, also known as ("aka") "Mike," aka "Maserati Mike," and RALPH MANNING, each aiding and abetting the other, knowingly and intentionally distributed oxycodone, a Schedule II narcotic drug controlled substance.

COUNT SIX

[21 U.S.C. §§ 841(a)(1), (b)(1)(C); 18 U.S.C. § 2(a)]

On or about May 18, 2016, in Los Angeles County, within the Central District of California, defendants MINAS MATOSYAN, also known as ("aka") "Mike," aka "Maserati Mike," and GARY HENDERSON, each aiding and abetting the other, knowingly and intentionally distributed hydrocodone, a Schedule II narcotic drug controlled substance.

## COUNT SEVEN

### [21 U.S.C. §§ 841(a)(1), (b)(1)(C)]

On or about May 18, 2016, in Los Angeles County, within the Central District of California, defendant FREDERICK MANNING JR., also known as "Freddie," knowingly and intentionally possessed with intent to distribute hydrocodone, a Schedule II narcotic drug controlled substance.

COUNT EIGHT

[21 U.S.C. §§ 841(a)(1), (b)(1)(C); 18 U.S.C. § 2(a)]

On or about June 17, 2016, in Los Angeles County, within the Central District of California, defendants MINAS MATOSYAN, also known as ("aka") "Mike," aka "Maserati Mike," RALPH MANNING, and HAYK MATOSYAN, aka "Hayko," each aiding and abetting the other, knowingly and intentionally distributed oxycodone, a Schedule II narcotic drug controlled substance.

1

## COUNT NINE

2

[21 U.S.C. §§ 841(a)(1), (b)(1)(C)]

3      On or about June 23, 2016, in Los Angeles County, within

4  the Central District of California, defendant MINAS MATOSYAN,

5  also known as ("aka") "Mike," aka "Maserati Mike" knowingly and

6  intentionally distributed oxycodone, a Schedule II narcotic drug

7  controlled substance.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COUNT TEN

[21 U.S.C. §§ 841(a)(1), (b)(1)(C)]

On or about June 23, 2016, in Los Angeles County, within the Central District of California, defendant GARY HENDERSON knowingly and intentionally possessed with intent to distribute oxycodone, a Schedule II narcotic drug controlled substance.

COUNT ELEVEN

[21 U.S.C. §§ 841(a)(1), (b)(1)(C)]

On or about June 27, 2016, in Los Angeles County, within the Central District of California, defendant ARMEN SIMONYAN, also known as ("aka") "Richard Simonson," aka "Nick," knowingly and intentionally possessed with intent to distribute oxycodone, a Schedule II narcotic drug controlled substance.

COUNT TWELVE

[21 U.S.C. §§ 841(a)(1), (b)(1)(C)]

On or about July 27, 2016, in Los Angeles County, within the Central District of California, defendant ARMEN SIMONYAN, also known as ("aka") "Richard Simonson," aka "Nick," knowingly and intentionally possessed with intent to distribute oxycodone, a Schedule II narcotic drug controlled substance.

COUNT THIRTEEN

[21 U.S.C. §§ 841(a)(1), (b)(1)(C)]

On or about October 21, 2015, in Los Angeles County, within the Central District of California, defendant MARISA MONTENEGRO knowingly and intentionally possessed with intent to distribute oxycodone, a Schedule II narcotic drug controlled substance.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COUNT FOURTEEN

[21 U.S.C. §§ 841(a)(1), (b)(1)(C)]

On or about October 23, 2015, in Los Angeles County, within the Central District of California, defendant MARISA MONTENEGRO knowingly and intentionally possessed with intent to distribute oxycodone, a Schedule II narcotic drug controlled substance.

COUNT FIFTEEN

[21 U.S.C. §§ 841(a)(1), (b)(1)(C); 18 U.S.C. § 2(a)]

On or about December 21, 2015, in Los Angeles County, within the Central District of California, defendants ELIZABETH GURUMDZHYAN and ANAIT GUYUMZHYAN, each aiding and abetting the other, knowingly and intentionally possessed with intent to distribute oxycodone, a Schedule II narcotic drug controlled substance.

COUNT SIXTEEN

[18 U.S.C. § 371]

A.   **OBJECTS OF THE CONSPIRACY**

Beginning on a date unknown, and continuing to a date not earlier than August 26, 2016, in Los Angeles County, within the Central District of California, and elsewhere, defendants MINAS MATOSYAN, also known as ("aka") "Mike," aka "Maserati Mike" ("MATOSYAN"), SABRINA GUBERMAN, aka "Susie" ("GUBERMAN"), FREDERICK MANNING JR., aka "Freddie" ("F. MANNING"), FRED MINASSIAN ("MINASSIAN"), and FIRST NAME UNKNOWN, LAST NAME UNKNOWN, aka "Cindy" ("CINDY"), and others known and unknown to the Grand Jury, conspired and agreed with each other to knowingly and intentionally commit one or more of the following offenses:

1.   Falsifying, concealing, and covering up by any trick, scheme, and device a material fact in a matter within the jurisdiction of the executive branch of the United States, in violation of Title 18, United States Code, Section 1001(a)(1);

2.   Making a false, fictitious, and fraudulent statement and representation in a matter within the jurisdiction of the executive branch of the United States, in violation of Title 18, United States Code, Section 1001(a)(2);

3.   Making and using any false writing and document containing any materially false, fictitious, and fraudulent statement and entry in a matter within the jurisdiction of the executive branch of the United States, in violation of Title 18, United States Code, Section 1001(a)(3); and

4.    Witness tampering, in violation of Title 18, United States Code, Section 1512(b)(3).

B.    **MEANS BY WHICH THE OBJECTS OF THE CONSPIRACY WERE TO BE ACCOMPLISHED**

The objects of the conspiracy were to be accomplished, in substance, as follows:

1-3.    The Grand Jury hereby repeats, re-alleges, and incorporates by reference paragraphs 10 through 12 of Section B of Count One of this Indictment as though fully set forth herein.

C.    **OVERT ACTS**

In furtherance of the conspiracy and to accomplish the objects of the conspiracy, on or about the following dates, defendants MATOSYAN, GUBERMAN, F. MANNING, MINASSIAN, and CINDY, and others known and unknown to the Grand Jury, committed various overt acts within the Central District of California, and elsewhere, including, but not limited to, the following:

1-34.    The Grand Jury hereby repeats, re-alleges, and incorporates by reference paragraphs 69 through 102 of Section C of Count One of this Indictment as though fully set forth herein.

COUNT SEVENTEEN

[18 U.S.C. § 1001(a)(3); 18 U.S.C. § 2(a)]

On or about July 1, 2016, in Los Angeles County, within the Central District of California, in a matter within the jurisdiction of the executive branch of the government of the United States, specifically, the United States Drug Enforcement Administration, defendants MINAS MATOSYAN, also known as ("aka") "Mike," aka "Maserati Mike" ("MATOSYAN"), SABRINA GUBERMAN, aka "Susie" ("GUBERMAN"), FREDERICK MANNING JR., aka "Freddie" ("F. MANNING"), FRED MINASSIAN ("MINASSIAN"), and FIRST NAME UNKNOWN, LAST NAME UNKNOWN, aka "Cindy" ("CINDY"), each aiding and abetting the other, knowingly and willfully made and used a false writing knowing the writing to contain a materially false, fictitious, and fraudulent statement and entry, in that defendants MATOSYAN, GUBERMAN, F. MANNING, MINASSIAN and CINDY created and arranged to create a document purporting to be from doctor N.D. ("N.D."), which defendant MINASSIAN sent via fax to a law enforcement officer investigating the seizure of hydrocodone pills from defendant F. MANNING on May 18, 2016, which letter falsely represented that, on May 10, 2016, N.D. examined defendant F. MANNING and prescribed hydrocodone to defendant F. MANNING, when, in truth and in fact, as defendants MATOSYAN, GUBERMAN, F. MANNING, MINASSIAN and CINDY then well knew, N.D. did not see defendant F. MANNING as a patient on May 10, 2016, and N.D. did not prescribe hydrocodone to defendant F. MANNING on May 10, 2016.

1  COUNT EIGHTEEN

2  [18 U.S.C. § 1001(a)(2)]

3     On or about July 6, 2016, in Los Angeles County, within the
4  Central District of California, in a matter within the
5  jurisdiction of the executive branch of the government of the
6  United States, specifically, the United States Drug Enforcement
7  Administration, defendant FRED MINASSIAN ("MINASSIAN") knowingly
8  and willfully made a materially false, fictitious, and
9  fraudulent statement and representation, in that defendant
10  MINASSIAN informed a law enforcement officer that he (defendant
11  MINASSIAN) believed that a letter that defendant MINASSIAN had
12  previously faxed to law enforcement on July 1, 2016 ("the
13  letter") accurately stated that co-defendant Frederick Manning,
14  Jr. ("F. Manning") had been treated by N.D. on May 10, 2016,
15  when, in truth and in fact, as defendant MINASSIAN then well
16  knew, the letter falsely represented that co-defendant F.
17  Manning had been treated by N.D. on that date, and, prior to
18  sending the letter, defendant MINASSIAN agreed that co-defendant
19  F. Manning and other co-conspirators would create the fraudulent
20  letter for the purpose of deceiving law enforcement.

21

22

23

24

25

26

27

28

COUNT NINETEEN

[18 U.S.C. § 1001(a)(2)]

On or about August 26, 2016, in Los Angeles County, within the Central District of California, in a matter within the jurisdiction of the executive branch of the government of the United States, specifically, the United States Drug Enforcement Administration, defendant FRED MINASSIAN ("MINASSIAN") knowingly and willfully made a materially false, fictitious, and fraudulent statement and representation, in that defendant MINASSIAN informed a law enforcement officer that co-defendant Frederick Manning, Jr. ("F. Manning") was being honest in claiming that the hydrocodone pills that law enforcement seized from co-defendant F. Manning's possession on May 18, 2016 had been prescribed to co-defendant F. Manning by doctor N.D. for medical treatment, when, in truth and in fact, as defendant MINASSIAN then well knew, co-defendant F. Manning did not receive such a prescription from N.D. and was not treated by N.D. prior to May 18, 2016, and defendant MINASSIAN knew that co-defendant F. Manning had lied to law enforcement about how co-defendant F. Manning acquired the hydrocodone.

FORFEITURE ALLEGATION

[21 U.S.C. § 853]

1.    Pursuant to Rule 32.2(a) of the Federal Rules of Criminal Procedure, notice is hereby given that the United States will seek forfeiture as part of any sentence, pursuant to Title 21, United States Code, Section 853, in the event of any defendant's conviction under any of Counts One through Fifteen of this Indictment.  Each defendant so convicted shall forfeit the following:

     a.   All right, title and interest in any and all property, real or personal, constituting or derived from, any proceeds which the defendant obtained, directly or indirectly, from any such offense;

     b.   All right, title and interest in any and all property, real or personal, used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of any such offense; and

     c.   To the extent such property is not available for forfeiture, a sum of money equal to the total value of the property described in subparagraphs 1(a) and (b) above.

2.    Pursuant to Title 21, United States Code, Section 853(p), any defendant so convicted shall forfeit substitute property, if, by any act or omission of the defendant, the property described in subparagraphs 1(a) or (b), or any portion thereof, cannot be located upon the exercise of due diligence; has been transferred, sold to, or deposited with a third party; has been placed beyond the jurisdiction of the court; has been

1  substantially diminished in value; or has been commingled with

2  other property that cannot be divided without difficulty.

3

4

5                                        A TRUE BILL

6

7                                        _/s/_____
                                         Foreperson

8

9  SANDRA R. BROWN
   Acting United States Attorney

10

11

12  LAWRENCE S. MIDDLETON
    Assistant United States Attorney
13  Chief, Criminal Division

14  KEVIN M. LALLY
    Assistant United States Attorney
15  Chief, Organized Crime Drug Enforcement
       Task Force Section

16

17  BENJAMIN R. BARRON
    Assistant United States Attorney
    Deputy Chief, Organized Crime Drug
18     Enforcement Task Force Section

19  JAMIE A. LANG
    Assistant United States Attorney
20  Organized Crime Drug Enforcement Task
       Force Section

21

22

23

24

25

26

27

28

54